IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 1:21-cr-50 (RDA) |
| ) | |
| EVER MATAMOROS MARTINEZ, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on the Government's Motion for a Preliminary Order of Forfeiture. Dkt. 50. The Court heard oral argument on the Motion on January 26, 2022, and this matter is now ripe for resolution. For the reasons that follow, the Court denies the Motion.

### I. BACKGROUND

Ever Matamoros Martinez ("Defendant" or "Mr. Martinez") engaged in a conspiracy to distribute cocaine between August and December of 2020. *See* Dkt. 28. On August 12, 2020, Defendant was contacted by phone by his co-conspirator, Jose Flores-Carduno. *Id.* ¶ 1. Flores-Carduno met with an undercover officer, who he sold a mixture and substance containing a detectable amount of cocaine at a Wawa gas station in Woodbridge, Virginia. *Id.* Flores-Carduno sold more cocaine to the undercover officer outside the Wawa station on September 1, 2020. *Id.* ¶ 2. Then, on September 8, 2020, Flores-Carduno sold the undercover officer cocaine at a Chipotle Mexican Grill near the gas station; on this occasion, Flores-Carduno also sold the officer an AR-15 style rifle bearing no serial number. *Id.* ¶ 3. Flores-Carduno contacted Defendant before and after this sale. *Id.*

About a week later, on September 16, 2020, Flores-Carduno again contacted Defendant before and after selling cocaine to the undercover law enforcement officer at the same gas station.

*Id.* ¶ 4. The following month, on October 8, 2020, Flores-Carduno once again contacted Defendant before meeting with an undercover officer to sell cocaine. *Id.* ¶ 5. That day, Defendant and a woman (presumably his girlfriend) were observed entering Flores-Carduno's vehicle. They were observed arriving at the Wawa, where Flores-Carduno exited the vehicle and met with the undercover law enforcement to sell him the promised cocaine. *Id.* Defendant and the woman remained in the vehicle truck during this transaction. *Id.*

On October 14, 2020, Flores-Carduno once again contacted Defendant before and after Flores-Carduno sold cocaine to an undercover law enforcement officer at the gas station. *Id.* ¶ 6. Flores-Carduno again sold the officer cocaine at the Wawa on October 29, 2020. *Id.* ¶ 7. A few weeks later, on November 10, 2020, Flores-Carduno again arranged to meet with the undercover law enforcement officer to sell him cocaine. *Id.* ¶ 8. Flores-Carduno also contacted Defendant before and after this controlled purchase at the Wawa. *Id.* Defendant and Flores-Carduno were observed together before this sale of cocaine. *Id.* They then arrived at the Wawa to conduct the controlled sale to undercover law enforcement, where Flores-Carduno sold the undercover law enforcement cocaine. *Id.* On December 4, 2020, Flores-Carduno was observed picking up Defendant and his girlfriend before another sale Flores-Carduno had arranged with an undercover officer. *Id.* ¶ 9. Together the three of them then arrived at the Wawa gas station to conduct the controlled sale to undercover law enforcement. *Id.*

In all, law enforcement paid Flores-Carduno a total of $19,750 in law enforcement funds for the 363.11 grams of cocaine he sold to the undercover officer. *Id.* ¶ 10.

On December 15, 2020, after a criminal complaint was issued alleging that he had conspired to distribute cocaine, Defendant was arrested. Dkt. 8 The pretrial services report prepared shortly after his arrest shows that although Defendant—a Honduran citizen—had

previously held a temporary visa to remain in the United States, the visa had expired. Dkt. 12. According to the report, Defendant would eventually be subject to removal proceedings because he was not lawfully in the United States. *Id.* Since at least 2004, he had performed manual labor in the the paving and contract industry for contractors and subcontractors in Northern Virginia. *Id.* He reported a net worth of $550, all cash, at the time of his arrest, and stated that he occasionally sent money to family in Honduras. *Id.* According to Defendant, in the course of investigating and prosecuting this offense, the Government seized all the cash he possessed.[1] *Id.*

On March 24, 2021, Defendant entered a pre-indictment guilty plea to a one-count Criminal Information for conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. Dkt. 26. He entered a plea agreement with the Government, *see* Dkt. 27, and the Court accepted his plea of guilty. This Court sentenced Defendant on September 22, 2021, imposing a term of imprisonment within the Sentencing Guidelines range—27 months. Dkt. 44. Defendant was also sentenced to a two-year term of supervised release, which he will serve if he is permitted to remain in the United States when he is released from incarceration. *Id.* At the sentencing hearing, the Government did not produce a consent order of forfeiture. Instead, counsel indicated that a proposed consent order would be submitted to the Court for its review, and the Court announced that it would defer the issue of forfeiture.[2] *Id.*

The Government, however, was unable to secure Defendant's signature on the proposed consent order of forfeiture. A week after sentencing, the Court had still not received an agreed-

---

[1] At the January 26, 2022 hearing on this matter, Defendant recalled the Government seizing approximately $400 in cash, which he stated he was not challenging or seeking to recover.

[2] Although forfeiture is a matter typically addressed before or at sentencing, the Court has jurisdiction to address the issue now because the record is clear in this case that the Court intended to take up the issue post-sentencing. *See United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011).

upon forfeiture order, and proceeded to enter judgment against Defendant on September 29, 2021. *See* Dkt. 46. The criminal judgment indicated that a "Consent Order of Forfeiture" was "to be entered by the Court," without referencing a specific dollar amount. *Id.* at 5. The Government instead filed a Motion for Preliminary Order of Forfeiture on October 27, 2021, arguing that Defendant agreed to this forfeiture in his Plea Agreement and that his Statement of Facts supports the requested monetary judgment. Dkt. 50. "Specifically, the government seeks the imposition of a monetary judgment in the amount of $19,750 with liability to be joint-and-several with separately prosecuted co-conspirator Jose Flores-Carduno in case 1:21-cr-34." *Id.* at 1. After several continuances, the Court held a hearing on this matter on January 26, 2022.

Defendant's co-conspirator, Jose Flores Carduno, pleaded guilty to conspiring to distribute cocaine and for possessing a firearm during the commission of a drug trafficking crime. The Court accepted his guilty plea on April 7, 2021, at which time the Court also entered a consent order of forfeiture in the amount of $19,750. Flores-Carduno was sentenced on January 26, 2022.

## II. STANDARD OF REVIEW

The Government bears the burden of establishing that certain property is forfeitable. *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010) ("The burden is on the government to establish, by a preponderance of the evidence, that the property at issue is subject to forfeiture"). The Government must prove the nexus between the property to be forfeited and the offenses of conviction by a preponderance of the evidence. *Libretti v. United States*, 516 U.S. 29 (1995) (holding that because criminal forfeiture is part of sentence and not a substantive element of the offense, the "preponderance of the evidence" standard applies). In assessing forfeiture, the Court may consider "evidence already in the record, including any written plea agreement, and . . . any additional evidence or information submitted by the parties and accepted by the court as relevant

and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). If the Court finds that forfeiture's "relevant prerequisites are satisfied," forfeiture must be imposed. *United States v. Blackman*, 746 F.3d 137, 143 (4th Cir. 2014) ("Insofar as the district court believed that it could withhold forfeiture on the basis of equitable considerations, its reasoning was in error.").

III. ANALYSIS

A. Developments in Federal Criminal Forfeiture Law

The Court first surveys relevant developments in the law of forfeiture as it relates to federal criminal proceedings. For many years, courts in the Fourth Circuit followed the principles articled in *United States v. McHan*, 101 F.3d 1027, 1043 (4th Cir. 1996), *abrogated by Honeycutt v. United States*, 137 S. Ct. 1626 (2017). In that case, the Fourth Circuit held that the general federal criminal forfeiture statute applicable to drug cases, 21 U.S.C. § 853(a), "is not limited to property that the defendant acquired individually." *McHan*, 101 F.3d at 1043. Reasoning that because 21 U.S.C. § 853(o) requires courts to "constru[e] that section liberally" "to effectuate its remedial purposes," *McHan* reasoned that the word "indirectly" in § 853(a)—which authorizes forfeiture of property "obtained, directly or indirectly," from the crime—extends liability to co-conspirator proceeds. *Id.* As a result, *McHan* broadly interpreted the statute to reach "all property that the defendant derived indirectly from those who acted in concert with him in furthering the criminal enterprise." *Id.* According to *McHan*, the "imposition of vicarious liability under § 853 also resonates with established criminal law principles." *Id.*

The Supreme Court overruled this holding in *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017), specifically citing the Fourth Circuit's *McHan* opinion as one of several circuit precedents that had incorrectly applied joint-and-several liability under 21 U.S.C. § 853(a). *See id.* at 1631 n.1. Focusing on statute regarding forfeiture of proceeds from certain drug crimes, 21

5

U.S.C. § 853(a)(1), the Fourth Circuit interpreted the unanimous Supreme Court's decision to "determine that § 853(a)(1) precludes co-conspirator liability." *United States v. Chittenden*, 896 F.3d 633, 637 (4th Cir. 2018). This statute, as the Supreme Court recognized, "defines forfeitable property solely in terms of *personal* possession or use." *Honeycutt*, 137 S. Ct. at 1632 (emphasis added). And Subsection (a)(1) limits forfeiture to "property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" the crime. 21 U.S.C. § 853(a)(1).

Significant to the disposition of this case, the Supreme Court held that for a defendant to have "obtained" property, he must have personally acquired it; one does not obtain property acquired by someone else. *Honeycutt*, 137 S. Ct. at 1632 ("Neither the dictionary definition nor the common usage of the word 'obtain' supports the conclusion that an individual 'obtains' property that was acquired by someone else."). The adverbs "directly" and "indirectly" modify the verb "obtain," but they "do not erase" the statute's requirement that the person in fact obtain the property. *Id.* at 1633. *Honeycutt* also addressed the substitute-asset statute, 21 U.S.C. § 853(p)(1), concluding that Congress "authorized the Government to confiscate assets only from the defendant who initially acquired the property and who bears responsibility for its dissipation." *Honeycutt*, 137 S. Ct. at 1634.

B. The Government's Forfeiture Arguments

The Government does not squarely address *Honeycutt* in its Motion, instead citing out-of-circuit cases that apply the decision to different facts.[3] In some cases, such as when two or more

---

[3] This is not to suggest that *Honeycutt*'s preclusion of joint-and-several liability in forfeiture has no application beyond the drug conspiracy context of 21 U.S.C. § 853 that formed the opinion's factual predicate. Although its full reach remains unsettled, *Honeycutt*'s reasoning has been applied by courts to other forfeiture statutes. *See, e.g.*, *Chittenden*, 896 F.3d at 636, 639

Case 1:21-cr-00050-RDA   Document 55   Filed 01/28/22   Page 7 of 13 PageID# 265

parties jointly control the corpus, *Honeycutt*'s prohibition against joint and several liability for forfeiture does not apply. This limitation makes sense in cases involving jointly controlled bank accounts, as the Fourth Circuit has recognized. *See United States v. Boutcher*, 998 F.3d 603, 611 n.10 (4th Cir. 2021). After all, "when a party jointly controls a bank account," in certain cases a court may conclude "that party 'actually acquire[s]' all the funds in the account." *Id.* (quoting *Honeycutt*, 137 S. Ct. at 1635). That is precisely what happened in *United States v. Goldstein*, 989 F.3d 1178, 1203 (11th Cir. 2021), and in *United States v. Masino*, No. 3:16-cr-17, 2019 WL 1045179, at *9 (N.D. Fla. Mar. 5, 2019), two of the authorities the Government cites. But even in multi-million dollar fraud cases, as *Chittenden* reveals, the Government cannot obtain a forfeiture order for property the defendant never acquired but that remained solely in the possession of her co-conspirator. *See also Boutcher*, 998 F.3d at 611 n.10 (citing *Chittenden*, 896 F.3d at 636, 639).

The conspiracy in this case is more straightforward than the extensive fraud schemes in those cases—over the course of about four months, two men conspired to sell a little less than $20,000 in cocaine to an undercover officer outside a gas station. Flores-Carduno sold the drugs, obtained the proceeds, and in turn accommodated Defendant for his role by giving him small quantities of cocaine. There was no shared bank account, no commingling of proceeds, and no interminable money laundering scheme that would give rise to an inference that both defendants "actually acquired" the entire $19,750 in proceeds "as the result of the crime." *Honeycutt*, 137 S. Ct. at 1635.

---

(applying *Honeycutt* to 18 U.S.C. § 982(a)(2), a criminal forfeiture statute covering crimes including bank and mail fraud); *United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017) (applying *Honeycutt* to 18 U.S.C. § 982(a)(7), a healthcare fraud statute); *United States v. Gjeli*, 867 F.3d 418 (3d Cir. 2017) (applying *Honeycutt* to 18 U.S.C. § 1963, the federal RICO statute); *United States v. Carlyle*, 712 F. App'x 862, 864 (11th Cir. 2017) (applying Honeycutt to 18 U.S.C. § 981(a)(1)(C), a civil forfeiture statute).

7

*Honeycutt*'s analytical framework leaves the door open for a court to order forfeiture against the kingpin of a conspiracy for proceeds he indirectly "obtains." *Honeycutt*, 137 S. Ct. at 1631-33. The Supreme Court illustrated the rule by way of example:

> Suppose a farmer masterminds a scheme to grow, harvest, and distribute marijuana on local college campuses. The mastermind recruits a college student to deliver packages and pays the student $300 each month from the distribution proceeds for his services. In one year, the mastermind earns $3 million. The student, meanwhile, earns $3,600. If joint and several liability applied, the student would face a forfeiture judgment for the entire amount of the conspiracy's proceeds: $3 million. The student would be bound by that judgment even though he never personally acquired any proceeds beyond the $3,600. This case requires determination whether this form of liability is permitted under § 853(a)(1). The Court holds that it is not.

*Honeycutt*, 137 S. Ct at 1631-32. The Court's holding shields the proverbial "college student" from joint and several liability; it envisions, however, that "the marijuana mastermind might receive payments directly from drug purchasers, or he might arrange to have drug purchasers pay an intermediary such as the college student." But "[i]n all instances," the mastermind "ultimately 'obtains' the property—whether 'directly or indirectly.'" *Id.* at 1633. This means a forfeiture order "for the entire amount of the conspiracy's proceeds" could, upon a proper evidentiary showing, run to the conspiracy's mastermind. *Id.* at 1631. *See United States v. Bangiyev*, 359 F. Supp. 3d 435, 440 (E.D. Va. 2019), *aff'd*, 771 F. App'x 328 (4th Cir. 2019) ("Lower courts have declined to apply *Honeycutt* in cases where the defendant held a position of control in the criminal operation.").

The issue here, however, is that the Government expressly disclaims that this is its theory of Defendant's joint-and-several forfeiture liability. According to the Government, "[n]either held a managerial or supervisory position in the conspiracy." Dkt. 50 at 6. And yet, the Government maintains that "both men obtained the $19,750." *Id.* As a result, the Government apparently abandons any argument that Defendant can reasonably be equated with the defendant in another

8

case its motion cites, *United States v. Ward*, No. 2:16-CR-6, 2017 WL 4051753, at *3 (W.D. Mich. Aug. 24, 2017) (concluding that defendant was "closely akin to the hypothetical marijuana mastermind described in *Honeycutt*" where he "was without question in charge of this conspiracy"; "grew the marijuana on his property and sold it through his storefronts"; "controlled the employees at the storefronts and made all the hiring and firing decisions"; and "was in charge of maintaining the growing facility on his property"). Neither does the evidence in the record or the Statement of Facts support a finding that Mr. Martinez was such a mastermind.[4]

At the hearing on this Motion, the Government contended that this case presents no *Honeycutt* issue because the Supreme Court's opinion deals only with "vicarious liability," not "joint and several liability." This argument finds no footing in the Supreme Court's decision. First, *Honeycutt* never mentions the term "vicarious liability." *See generally Honeycutt*, 137 S. Ct. at 1626. Moreover, the *Honeycutt* opinion is replete with references to "joint and several liability" and whether "a defendant may be held jointly and severally liable," *see id.* at 1630-34— indeed, that is the opinion's central focus. *See Chittenden*, 896 F.3d 633, 637, 638 ("'[T]he statute does not countenance joint and several liability' for property the defendant's co-conspirators alone obtained . . . [t]he *Honeycutt* Court further found that 21 U.S.C. § 853(p)—'the sole provision of § 853 that permits the Government to confiscate property untainted by the crime'—makes clear

---

[4] The remaining citations in the Government's brief are also unavailing. In *United States v. Khan*, 761 F. App'x 43 (2d Cir. 2019), the Second Circuit held that "*Honeycutt*'s limitation on forfeiture orders does not apply here because there is no conspiracy charge, no joint and several liability, and Khan was ordered to pay only proceeds he himself acquired." *Id.* at 47. That is plainly not true here, a conspiracy case where the Government has attempted to impose joint-and-several forfeiture liability on a Defendant for proceeds he did not actually acquire.

The Government's reference to a footnote in *United States v. Purify*, 743 F. App'x 187, 191 (10th Cir. 2018) draws on the gross proceeds versus net profits distinction, an issue that speaks to the methods the Government may use to determine the total forfeiture amount—not whether joint and several liability is permitted in this case.

that the statute cannot permit joint and several liability") (quoting *Honeycutt*, 137 S. Ct. at 1632-33, 1637).

Accordingly, none of the suggested means of avoiding *Honeycutt* are persuasive. This is a relatively simple drug conspiracy case involving the exact same general federal criminal forfeiture statute the Supreme Court addressed in *Honeycutt*. No party to these proceedings argues that Defendant is a mastermind of the conspiracy. And *Honeycutt* plainly "altered the legal landscape regarding criminal forfeitures for a co-conspirator." *Masino*, No. 3:16-cr-17-MCR, 2019 WL 1045179, at *9 (N.D. Fla. Mar. 5, 2019), *aff'd*, No. 18-15019, 2021 WL 3235301 (11th Cir. July 30, 2021). The pre-*Honeycutt* scheme of joint and several liability "put[] defendants on the hook regardless of their share of the fault or the proceeds," meaning it "'require[d] forfeiture of untainted property' as well as amounts the defendant did not 'obtain[ ].'" *United States v. Bradley*, 897 F.3d 779, 783 (6th Cir. 2018) (citing *Honeycutt*, 137 S. Ct at 1632-33); *cf. United States v. Glenn*, 794 F. App'x 19, 23 (2d Cir. 2019) (upholding forfeiture order "apportioning the forfeiture amount" at one-half of total loss as "a reasonable approximation" as to one of two defendants under *Honeycutt*). The Government here does not seek reasonable apportionment of the forfeiture amount as to Defendant, and instead "seeks the imposition of a monetary judgment in the amount of $19,750 with liability to be joint-and-several with separately prosecuted co-conspirator Jose Flores-Carduno." Dkt. 50 at 1. But "*Honeycutt* puts an end to such collective liability," *Bradley*, 897 F.3d at 783—at least in cases, like this one, that sit at the heartland of *Honeycutt*. This Court cannot evade directly applicable Supreme Court precedent.

### C. Application to Defendant's Case

Against this legal backdrop, the Court turns to the facts of this case. In the Government's narrative, the Defendant actually obtained $19,750 in proceeds of the crime "[b]ecause they

10

showed up together and worked together on each and every transaction involved in this case."[5] But that definition of actual acquisition reflects a *McHan*-era, pre-*Honeycutt* conception of what it means to "obtain" property: "the adverbs 'directly' and "indirectly'" in § 853(a)(1) "refer to how a defendant obtains the property; they do not negate the requirement that he obtain it at all." *Honeycutt*, 137 S. Ct. at 1633. After *Honeycutt*, "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime." *Id.* at 1635. Therefore, this Court must determine whether the Government has met its burden of proving by a preponderance of the evidence that the amount subject to forfeiture, $19,750, is property Defendant *personally obtained* as the result of this offense.

The Government identifies no facts in the record to support a finding that Defendant personally obtained $19,750 in proceeds from the conspiracy. The record evidence proves that Flores-Carduno "sold" cocaine to an undercover officer in exchange for Flores-Carduno being paid $19,750 in cash between August and December of 2020. *See, e.g.*, Dkt. 28 at 1 ("Flores-Carduno met with the undercover law enforcement at the WAWA gas station parking lot located in Woodbridge, Virginia where he sold undercover law enforcement" cocaine). There is no evidence in the record to suggest that Defendant and Flores-Carduno jointly acquired the proceeds and then divided them among themselves by joint decision. There is also no evidence that Defendant had control of the entire $19,750 in proceeds or could control the distribution of the conspiracy's proceeds. Instead, Defendant would contact the supplier, pick up the cocaine, and

---

[5] The Statement of Facts suggests that Defendant was physically present for three of the transactions—on October 8, 2020, on November 10, 2020, and on December 4, 2020—though he spoke to Flores-Carduno over the phone before and/or after several more of Flores-Carduno's sales to the undercover officer. *See* Dkt. 28.

deliver the drugs to Flores-Carduno. He did not receive any cash, or apparently even a portion of the cocaine Flores-Carduno sold, for his own redistribution.

As the Statement of Facts makes clear, Defendant did not personally sell any cocaine. *See generally* Dkt. 28. It appears that his involvement in the conspiracy resulted in obtaining comparatively small quantities of cocaine for his own personal use. That inference is further supported by the fact that when law enforcement executed search warrants on Flores-Carduno's and Defendant's homes, they recovered 90 grams of cocaine from Flores-Carduno's home, significantly less than the 17 grams from Defendant's. This fact is consistent with Defendant obtaining small quantities of cocaine for personal use by himself and his girlfriend.

As the Presentence Report acknowledges, the "Plea Agreement in this case contains some standard language" regarding forfeiture. Dkt. 41 at 3. The Court reads the parties' Plea Agreement to proscribe Defendant from challenging an order of forfeiture; but here, the Court has found that the prerequisites of forfeiture have not been satisfied and will not enter a preliminary order of forfeiture. Therefore, there is no forfeiture order for Defendant to challenge. To the extent the consent order of forfeiture the Government secured in *United States v. Flores Carduno*, No. 1:21-cr-34 (E.D. Va. Apr. 7, 2021) (ECF No. 34) purports to authorize joint-and-several liability as to Mr. Martinez, *Honeycutt* prevents the operation of that money judgment against Mr. Martinez for any proceeds of the crime that he did not personally acquire.

Here, there is no forfeiture order, and the facts of this case do not support entering one now, after the Government has already secured a consent order of forfeiture for $19,750—the entire proceeds of the offense—from Defendant's co-conspirator, Jose Flores-Carduno. Even if the Court's conclusion about joint-and-several liability were incorrect, the Government has secured a money judgment that orders forfeiture for the full measure of loss resulting from this sting

operation. *See United States v. Flores Carduno*, No. 1:21-cr-34 (E.D. Va. Apr. 7, 2021) (ECF No. 34 at 2) (authorizing a money judgment for the United States "for $19,750, an amount that represents the illegal proceeds the defendant obtained from Count One of the Criminal Information"). Section 853(a)(1) does not authorize entry of a forfeiture judgment for proceeds that Mr. Martinez never himself obtained.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that the Motion (Dkt. 50) is DENIED.

It is SO ORDERED.

Alexandria, Virginia
January 28, 2022

/s/
Rossie D. Alston, Jr.
United States District Judge